IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 24, 2017 Session

## JESUS VIDAL RODRIGUEZ, ET. AL. v. BRIDGESTONE/FIRESTONE NORTH AMERICAN TIRE, LLC., ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 05C-1555**      **Thomas W. Brothers, Judge**

_____

### No. M2013-01970-COA-R3-CV

_____

This is an appeal from a jury verdict in favor of the defendants in a products liability action arising out of a deadly vehicle crash in Mexico. The accident was allegedly caused by a separation of the tire tread and resulting blow-out and vehicle rollover. The decedent's son, daughter, and mother brought suit against the manufacturers of the tire and SUV. The case went to trial, and the jury returned a verdict in favor of the defendants. Plaintiffs appeal an instruction the court gave the jury on contributory negligence and several evidentiary rulings. Finding no reversible error, we affirm the judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

Steve North, Madison, Tennessee; Donald Capparella, Nashville Tennessee; and Richard L. Denney, Norma, Oklahoma, for the appellants, Jesus Vidal Rodriguez and Daniela Vidal Rodriguez.

A. Scott Ross and J. Isaac Sanders, Nashville, Tennessee; Stephen A. Marcum, Huntsville, Tennessee; and Wade C. Crosnoe, Austin, Texas, for the appellees, Bridgestone Firestone North American Tire, LLC, and Ford Motor Company.

### OPINION

## I. Factual and Procedural History

On September 27, 2000, Jesus Alfonso Vidal Ramirez was involved in a fatal accident in the Mexican state of San Luis Potosi while driving a 1998 Ford Explorer

equipped with Firestone Wilderness AT tires.[1]  Mr. Vidal's son Jesus Vidal Rodriguez, Mr. Vidal's daughter Daniela Vidal Rodriguez, and his mother Margarita Ramirez Valenzuela Lamicq (collectively, "Plaintiffs")[2] filed suit against Bridgestone/Firestone and Ford Motor Company (collectively, "Defendants")[3] on January 31, 2001 in Davidson County Circuit Court.  The suit was consolidated for pretrial purposes with 30 other suits based on automobile accidents in Mexico involving Ford and Firestone products. *In re Bridgestone/Firestone*, 138 S.W.3d 202, 204 (Tenn. Ct. App. 2003) *perm. app. denied* (Tenn. June 1, 2004) ("*Firestone I*").

Defendants moved to dismiss the cases under the doctrine of *forum non conveniens*, which the trial court denied. *Id.*  This Court granted Defendants' application for extraordinary appeal, *id.* at 205, considered the private interests and public factors to be analyzed in determining whether to apply the doctrine of *forum non conveniens*, and concluded:

> In the present matter, all the deceased were from Mexico; all the plaintiffs are from Mexico; the cars and tires at issue were purchased in Mexico; the cars and tires at issue were serviced and maintained in Mexico; the accidents all occurred in Mexico; and Mexican law will govern all substantive issues. In short, the present litigation is of primary local interest to Mexico, rather than Tennessee. The plaintiffs' allegations of a conspiracy involving Firestone are not sufficient to counterbalance Mexico's interest, as a sovereign nation, in deciding controversies that involve its citizens and occur within its borders.

*Id.* at 210.  We held that "the courts of Mexico provide[d] an available alternative forum," reversed the denial of the motion to dismiss, dismissed the case. *Id.* at 207, 210. The Tennessee Supreme Court denied permission to appeal the Court of Appeal's decision.  Plaintiffs refiled the case in Mexico, where it was dismissed for lack of subject matter jurisdiction because the Defendants were not domiciled there.

---

[1] We shall use the paternal surname of "Vidal" in reference to the decedent and his children, as did the trial court and parties in the case.

[2] Margarita Ramirez Valenzuela Lamicq died while the case was pending.  In an agreed order entered December 17, 2012, the following was announced:

> All claims brought by or on behalf of Plaintiff Margarita Ramirez Valenzuela Lamicq are hereby dismissed with prejudice. The only Plaintiffs asserting claims are the children of Jesus Vidal Ramirez: Jesus Vidal Rodriguez and Daniela Vidal Rodriguez. Both are now adults and assert these claims individually on their own behalf. Their mother, Elena Maria Rodriguez Reyes, asserts no claim in this case.

[3] Defendant Bridgestone Corporation was dismissed from the suit at Plaintiffs' request, by order entered September 17, 2012.

Plaintiffs refiled the suit in Davidson County on May 26, 2005, asserting causes of action for negligence, strict liability, and violations of the Tennessee Consumer Protection Act of 1977 as to Firestone and Ford and civil conspiracy and breach of implied warranty of merchantability under the Uniform Commercial Code as to Firestone, Bridgestone, and Ford. The complaint alleged that the accident occurred when the tread on one of the tires separated, resulting in a blow-out and vehicle rollover. Plaintiffs sought general damages in the amount of $10 million, special damages in the amount of $1 million, pecuniary loss and loss of consortium in the amount of $5 million, punitive damages in the amount of $10 million, and treble damages for violations of the Tennessee Consumer Protection Act. The case was again consolidated with other cases against the same Defendants.

Defendants moved to dismiss the case on the grounds of collateral estoppel, arguing that the issue of *forum non conveniens* and the availability of Mexico as an available alternative forum had been determined in their favor in *Firestone I*, and accordingly, Plaintiffs were precluded from claiming that a Mexican forum was unavailable. The trial court denied the motion and granted Defendants permission for an interlocutory appeal. We granted the appeal and in *In re Brigestone/Firestone*, 286 S.W. 3d 898, 900 (Tenn. Ct. App. 2008) ("*Firestone II*"), determined that fairness dictated reconsideration of the issue of the availability of Mexico as an alternate forum for Plaintiffs claims. *Id.* at 909. We vacated the order denying the motion to dismiss and remanded for the trial court to "consider whether the Plaintiffs acted in good faith in the Mexican proceedings, whether the Mexican proceedings were manipulated to achieve dismissal by the Mexican courts, and whether the Mexican court decisions are entitled to recognition here." *Id.* at 909.

On remand, discovery ensued in the consolidated cases, and the trial court held an evidentiary hearing. On March 21, 2012, the court issued a 35-page opinion finding no bad faith on the part of the Plaintiffs in this case and in 14 other cases; the court denied the motion to dismiss as to those 15 cases. Defendants sought permission to appeal the denial of their motion to dismiss; we denied their application, and this case proceeded to trial.

Prior to trial, the court entered an order guiding further proceedings, holding:

The parties agree that the pertinent provisions of the Civil Code of San Luis Potosi governing liability are found in Chapter Five, Article 1746 of the SLP Civil Code which states:

[Provision of the Code in Spanish Omitted]

CHAPTER V
Regarding the obligations arising from wrongful acts

3

ART. 1746 - He who acting unlawfully or against good customs causes damage to another, is obliged to repair, unless he proves that the damage was the result of inexcusable negligence or fault of the victim.

Plaintiffs allege the following causes of action against both Defendants in their complaint:

1. Negligence (Counts I and IV);
2. Strict Liability (Counts II and III);
3. Civil Conspiracy (Count V);
4. Violation of the Tennessee Consumer Protection Act (Count VI);
5. Breach of Implied Warranty of Merchantability Under U.C.C. (Count VII); and
6. Punitive Damages (Paragraphs 51-61).

Defendants argued in their earlier briefs that there were essentially six (6) distinctions between the law of San Luis Potosi and Tennessee:

1. Mexican law does not provide a cause of action for strict liability against manufacturers, designers, or sellers of allegedly defective products.
2. Mexican law provides a warranty claim, but the damages are limited to the replacement of the product or refund, in whole or in part, of the purchase price.
3. Under Mexican law, Plaintiffs material damages will be limited to four times the minimum daily wage for 730 days plus two months of salary for funeral expenses.
4. Under Mexican law, the decedent's estate cannot recover moral damages on behalf of the decedent.
5. The purpose of moral damages is to compensate a plaintiff for injury to his integrity. Punitive damages are not permitted under Mexican law.
6. Mexican law does not permit recovery for damages already paid by a collateral source, such as insurance proceeds.

Of these six points, four relate to damages. The two points dealing with liability are conceded by Plaintiffs. The parties agree that in this case:

• There is no cause of action under SLP law for strict liability;
• Plaintiffs are not pursuing a distinct claim based on breach of warranty;
• The Tennessee Consumer Protection Act has no application in this action since it involves a death; and
• They agree that punitive damages are unknown in Mexican law.

4

The order concluded that "[t]he gravamen of Plaintiffs' claim is that Defendants breached their duty of care in the design, manufacture and marketing of the tires in question resulting in the creation of unsafe tires and vehicles" and in "conspir[ing] to conceal the unsafe nature of the tires and their suitability for use on Ford vehicles." Trial began on January 28, 2013, and lasted for several weeks.

Plaintiffs called eighteen witnesses to testify live or by video deposition: Charles White, former head of Ford light trucks; Francis Figliomeni, an engineer with Firestone working in the advanced tire engineering department; David Renfroe, an expert in vehicle dynamics during a tire tread separation; Richard Bond, Ford's test driver; Officer Erick Quintero, the police officer who investigated the decedent's accident; Troy Dehne, an employee of Ford; William Clay Ford, former Chief Executive Officer of Ford Motor Company; Thomas Baughman, who testified that he was "an engineering director for Ford Trucks" and in late 2000, was "on special assignment at World Headquarters leading the Firestone team effort in terms of investigation of the Firestone Explorer concern" and at the time of trial, was Ford's executive director of product development; Dennis Carlson, Plaintiff's expert in tire failure analysis; Elena Maria Rodriguez, the decedent's ex-wife; Daniela Vidal Rodriguez; daughter of the decedent; Jesus Vidal Rodriguez, son of the decedent; Jorge Gonzales, president of Bridgestone/Firestone of Mexico; Lisa Klein, Executive Director for Global Vehicle Procurement for Ford Motor Company; Alfonso Vidal Ramirez, brother of the decedent; Alejandro Espinoza Alvarado, a witness to the scene of the accident; Jacques Nasser, President and CEO of Ford Motor Company; and John Lampe, former CEO of Bridgestone/Firestone.

At the close of Plaintiffs' proof, Defendants moved for a directed verdict, which the court granted in part, dismissing Plaintiffs' claims based on civil conspiracy. In their case in chief, Defendants called five witnesses: Donald Frank Tandy, Jr., an expert in vehicle dynamics and crash reconstruction; Brian Queiser, who was involved in the design of the tire at issue; Allen Powers, a mechanical engineer and accident reconstructionist; Robert Pascarella, a mechanical engineer who works at Ford; and Joseph Grant, engineer and wheel consultant.[4]

At the close of trial, Defendants renewed their motion for a directed verdict, asserting additional grounds. The court granted the motion with respect to the claims of gross negligence and liability based on failure to warn; in all other respects, the motion was denied. The jury returned a verdict finding neither Defendant to be at fault, and judgment was entered on the jury verdict. Plaintiffs filed a motion for a new trial, and after a hearing, the court denied the motion.

---

[4] No party has cited to evidence that any of the experts were not properly qualified. As no party has challenged the qualification of any witness as an expert, unless otherwise noted we presume that each expert was properly qualified to give opinions as to the subject matter on which each testified.

Plaintiffs appeal and raise two issues for our review:[5]

1. Whether the trial court committed cumulative reversible error with certain evidentiary rulings.
2. Whether the trial court committed reversible error by instructing the jury on contributory negligence.

Defendants raise the following issue: ". . . [W]hether this case should have been dismissed before trial based on the collateral estoppel effect of this Court's 2003 *forum non conveniens* decision."

## II. DISCUSSION

At the outset of our analysis, we note that Plaintiffs have identified two issues for review; within the first issue in the argument portion of their brief, they discuss nine sub-issues, each of which requires a cross-reference to a paragraph in a portion of their brief which they have called the "Statement of Material Facts." Many of the citations to the record in both the "Statement of Material Facts" and the argument portion of their brief are not in compliance with Rule 27(a)(6), (7)(A), and (g) of the Rules of Appellate Procedure, as well as Rule 6(a)(1), (b) of the Rules of the Tennessee Court of Appeals. Rather than making an "appropriate" reference to the page(s) at which the evidence at issue was identified, offered, and received or rejected or which otherwise serves as the basis for Plaintiffs' claim of error, Tenn. R. App. P. 27(g), many citations are to voluminous spans (sometimes hundreds) of pages in the transcript.

The record in this case consists of 79 volumes of technical record; 44 volumes of transcripts of hearings, pretrial rulings, and the trial; 20 DVDs of the pretrial proceedings and trial; 14 volumes of depositions; 648 exhibits; and 29 sealed volumes. As we noted in *England v. Burns Stone Co., Inc.*, "This Court is not under a duty to minutely search a voluminous record to locate and examine matters not identified by citation to the record. . . . Parties cannot expect this Court to do the work of counsel." 874 S.W.2d 32, 35 (Tenn. Ct. App. 1993) (citing *McReynolds v. Cherokee Insurance Co.,* 815 S.W.2d 208 (Tenn. Ct. App. 1991). We have endeavored to conduct our analysis and resolution of this appeal within the confines of the challenges presented by Plaintiffs' brief.

---

[5] Prior to the parties filing briefs, all proceedings were stayed by this Court pending the resolution of *In Re Bridgestone/Firestone*, 495 S.W.3d 257 (Tenn. Ct. App. 2015), *perm. app. denied* Nov. 24, 2015, and the stay was later extended pending the resolution of *Torres, et al. v. Bridgestone/Firestone North American Tire, LLC, et al.*, 498 S.W.3d 565 (Tenn. Ct. App. 2016), *perm. app. denied* (Tenn. Aug. 18, 2016). Upon the resolution of both cases, the stay was lifted.

### A. Evidentiary Rulings

### 1. "Golden Rule" Argument[6]

Plaintiffs first contend that the court erred in denying their motion for mistrial, which they made following these comments by Ford's counsel during closing arguments:

> . . . [A] lot of this stuff is based on expert testimony. And then you have to sort of look at the expert testimony and evaluate what you think of it. The question of whether or not Mr. Vidal was negligent because of the five punctures and six repairs, there are no experts on that.
> You guys all drive cars. You all maintain cars. This is all common sense.
> So the question being asked of you with respect to that question is really very straightforward, and it doesn't require any expert testimony. The question being asked of you is the same one that Mr. Carlson opined on: Would you want your family driving around in a car that had a tire that had six -- five punctures in it? That's it. If the answer is it's okay, it's fine, then it probably isn't negligence.
>
> [Counsel for Plaintiffs]: Your Honor, I object. May I approach the bench?

Following the objection, arguments were made at the bench, during which counsel clarified that he objected based upon his belief that opposing counsel was not "allowed to do that, to ask the jury to put themselves in the position of the plaintiff." The court then dismissed the jury, reviewed the video recording of the statements of counsel, and sustained the objection. The following colloquy then occurred:

> MR. DENNEY: Your Honor, . . . I need to ask for a mistrial for the record or special instruction.
> THE COURT: What's the special instruction you'd like?
> MR. DENNEY: That the jury be instructed that it's improper to ask them to do that, and they should disregard that statement, in a conclusory statement from the Court.
> THE COURT: I'll be glad to give a limiting instruction. I don't think it's such a severe violation that it mandates a mistrial. The request for mistrial is respectfully denied. But I will give a limiting instruction.

---

[6] This issue addresses Plaintiffs' motion for a mistrial. Though Plaintiffs characterize this as an evidentiary matter in their brief on appeal, the decision on the motion for mistrial was based upon the argument of counsel, which is not a matter of evidence. In any event, we review the ruling denying the motion under the abuse of discretion standard, as is also applied to our review of evidentiary rulings.

After the jury retuned, the court gave the following instruction:

> Ladies and gentlemen, I need to give you a limiting instruction. Right as we broke, you heard as part of the argument with – [Counsel for Defendant] inadvertently asked you to put yourself in a position of someone doing this or that. That's an improper argument, and I sustained the objection to that. You're not permitted to do that. That's not what you're called on to do. You're here as judges of the facts on it.
>
> The objection is sustained.

Plaintiffs contend that the trial court erred in overruling the motion for mistrial, arguing that the statements made were a golden rule argument, which "comes about when counsel asks the jury to put itself in the place of the plaintiffs, and such is error." *Miller v. Alman Const. Co.*, 666 S.W.2d 466, 468 (Tenn. Ct. App. 1983).

"Whether to grant a mistrial is a decision left to the discretion of the trial court." *Teague v. Kidd*, No. E2016-01995-COA-R3-CV, 2017 WL 2299059, at *4 (Tenn. Ct. App. May 25, 2017) (citing *Hunter v. Ura*, 163 S.W.3d 686, 699 (Tenn. 2005); *McCullough v. Johnson City Emergency Physicians*, *P.C.*, 106 S.W.3d 36, 47 (Tenn. Ct. App. 2002)). We will only reverse a discretionary judgment of a trial court if it is apparent that the "'decision was against logic or reasoning, and caused an injustice or injury to the party complaining.'" *Id.* (quoting *McCullough v. Johnson City Emergency Physicians, P.C.,* 106 S.W.3d 36, 47–48 (Tenn. Ct. App. 2002) and citing Tenn. R. App. P. 36(b). The burden of establishing the need for mistrial lies with the party that seeks it. *Id.* (citing *State v. Moss*, No. M2014-00746-CCA-R3-CD, 2016 WL 5253209, at *24 (Tenn. Crim. App. Sept. 21, 2016), *perm. app. denied*, (Tenn. Jan. 19, 2017)). This Court addressed a similar issue in *Doochin v. U.S. Fid. & Guar. Co.* and held:

> Where the trial judge overrules a motion for a new trial based on improper argument, this court has required a new trial only where it felt that the argument was "unwarranted and made for the purpose of appealing to passion, prejudice and sentiment, which cannot be removed by the trial judge's sustaining an objection of opposing counsel, or unless we affirmatively find that such argument affects the results of the trial." *Guess v. Maury,* 726 S.W.2d 906, 913 (Tenn. App. 1986). The appellate courts have been more inclined to reverse the judgment where counsel's misconduct has been persistent. *See English v. Ricks,* 117 Tenn. 73, 78, 95 S.W. 189, 190 (1906); *Prewitt-Spurr Mfg. Co. v. Woodall,* 115 Tenn. 605, 609, 90 S.W. 623, 624 (1905).

854 S.W.2d 109, 116 (Tenn. Ct. App. 1993).

8

The trial court sustained the objection to the argument, admonished counsel, and gave a curative instruction as requested by Plaintiffs. From our review of the entire closing argument made by Ford's counsel, we do not discern any evidence that these remarks were made for the purpose of appealing to passion, such that the judgment was affected or warranted a mistrial. The curative instruction was sufficient, and we find no abuse of discretion in the court's overruling the motion for mistrial.

We now turn to the eight evidentiary rulings Plaintiffs contend were error.

Decisions regarding the admission or exclusion of evidence are entrusted to the trial court's discretion and will not be disturbed on appeal unless the trial court abused its discretion. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008) (citing *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004); *State v. James*, 81 S.W.3d 751, 760 (Tenn. 2002). An abuse of discretion occurs when the court applies incorrect legal standards, reaches an illogical conclusion, or employs reasoning that causes an injustice to the complaining party. *Banks*, 271 S.W.3d at 116 (citing *Konvalinka v. Chattanooga–Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)). When we review the trial court's exercise of discretion, we presume that the court's decision is correct and review the evidence in a light most favorable to upholding the decision. *Lovlace v. Copley*, 418 S.W.3d 1, 16-17 (Tenn. 2013) (citing *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011)). As noted in *White v. Vanderbilt University*:

> Appellate courts will set aside a discretionary decision only when the trial court has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of the evidence. Thus, a trial court's discretionary decision should be reviewed to determine: (1) whether the factual basis for the decision is supported by the evidence, (2) whether the trial court identified and applied the applicable legal principles, and (3) whether the trial court's decision is within the range of acceptable alternatives. Appellate courts should permit a discretionary decision to stand if reasonable judicial minds can differ concerning its soundness. …The erroneous exclusion of evidence will not require reversal of the judgment if the evidence would not have affected the outcome of the trial even if it had been admitted.

21 S.W.3d 215, 222-23 (Tenn. Ct. App. 1999). With this deferential standard in mind, we proceed to examine the rulings that Plaintiffs contend were error.

### 2. Limitation on Evidence of the Alleged Civil Conspiracy to Dates Prior to the Sale of the Explorer to Mr. Vidal

Plaintiffs contend that the court erred in making the following ruling:

9

And so the proof that's going to be introduced on this failure to warn or conspiracy is going to be limited, then, to proof of notice pre-July 31, 1998 and conspiracy not to warn pre-July 31, 1998. And in the event I do allow postsale events or incidents to come in as proof of the nature of the defect itself, I think it's appropriate to give a limiting instruction at that time that it cannot be considered by the jury for purposes of determining failure to warn or any kind of conspiracy.

Plaintiffs argue that the ruling limited their ability to put on proof of the Defendants' negligence in failing to warn the decedent by excluding records of Ford and Firestone "generated between the dates corresponding to the sale of the subject vehicle and the subject accident, making the linchpin of Plaintiffs' case the Defendants' post-sale duty to warn Mr. Vidal of the perilous defects in the subject vehicle/tire combination."

Plaintiffs assert that "in pretrial briefing . . . [they] proffered voluminous evidence . . . in support of their civil conspiracy claim"; they do not, however, cite us to an attempt to introduce these records or proffer them as exhibits at trial.[7]

In the complete ruling, the court explains its reasoning and that it ruled after determining that "postsale duty to warn is not recognized as a separate tort action in Tennessee" and that "[t]here is no proof that's been submitted to me that such a theory of recovery has ever been adopted by any Court in San Luis Potosi or from any other state of Mexico or in the federal courts of Mexico." Considered in this context, the ruling was proper. This case was governed by the law of the Mexican State of San Luis Potosi, and Plaintiffs do not challenge the decision that the law of San Luis Potosi applies[8] or that San Luis Potosi law does not recognize a post-sale duty to warn consumers about alleged

---

[7] As to this issue, in their brief, they cite to 200 pages of their response to Defendants' omnibus motion *in limine*, with exhibits; this is not an "appropriate" citation within the meaning of Rule 27 of the Tennessee Rules of Appellate Procedure. Neither are Plaintiffs' two other citations relative to this issue helpful. Plaintiffs' citations in the "Statement of Material Facts" are to three pages of the record containing "Plaintiffs' Designation of Deposition Testimony and Exhibits Subject to the Protective Order." The three-page designation recites that it was filed "in compliance with the Court's Order" but no other background information is provided and consists of designations to portions of Mark Tippett's deposition. Nowhere do Plaintiffs cite to the location in the record of the deposition of Mark Tippett, but they assert that the "relevant excerpts" of that testimony were reproduced "for the Court's convenience" in the appendix to their brief. The appendix, however, does not contain any excerpts from Mr. Tippett's deposition; rather, the appendix pages contain testimony and exhibits from the deposition of Lisa Klein. Ms. Klein testified in her deposition that by 1997 Ford was aware of the fact that several Explorers had turned over unexpectedly as a result of a tire explosion and that Ford conducted investigations and took action.

[8] In *Firestone I*, this Court concluded that "Mexican law will govern all substantive issues" in the consolidated cases at issue, including the one at bar. *Firestone I,* 138 S.W.3d at 210; *see also Torres,* 498 S.W.3d at 577.

product defects; accordingly, evidence relating to the Defendant's post-sale conduct was irrelevant and therefore inadmissible. The court did not abuse its discretion by limiting the evidence of the alleged conspiracy to the period prior to the date of the purchase of the SUV.

Further, because the law of San Luis Potosi applies, the Plaintiffs' arguments relating to the Federal Motor Vehicle Safety Act are without merit.

### 3. Evidence of Design Defect Recalls

Plaintiffs contend in their "Statement of Material Facts" that:

The trial court refused to allow Plaintiffs, on cross-examination, to show that over 14 million Firestone tires were taken out of service due to design defects in order to rebut the direct testimony of defense expert Joseph Grant[9] that design defects in Bridgestone/Firestone tires "are extremely rare."

Plaintiffs' counsel attempted to use a report of tire recalls printed out from the National Highway and Traffic Safety Administration ("NHTSA") website to aid in cross examination of Mr. Grant, leading to the following:

Q. Yesterday you told this jury that design defects in manufactured tires are extremely rare events, that because of the standards that are out there these days and the way the companies operate, design defects in lines of tires are, in your words, "extremely rare"; is that correct?
A. Yes.
Q. Now, Mr. Grant, if you had gone to the public information available on the NHTSA website, you would have found out that's not a true statement, wouldn't you?

Before the witness could answer, Defendants' counsel objected on numerous grounds including lack of foundation, unfair prejudice, and hearsay. The court excused the jury and Mr. Grant from the courtroom and heard the arguments of counsel about the NHTSA report, at the end of which the court ruled that the report could be used to attempt to impeach Mr. Grant in accordance with Rule 618 of the Tennessee Rules of Evidence.[10]

---

[9] Mr. Grant testified that he is a mechanical engineer who worked as a tire engineer for Continental Tire prior to retiring in 2005 and currently works as a consultant providing "forensic analysis of tires that have failed in service."

[10] Rule 618 reads:

To the extent called to the attention of an expert witness upon cross-examination or relied

11

After the jury and witness returned to the courtroom, the examination continued. Mr. Grant stated that he was familiar with the NHTSA annual report on defects and recalls and "pay[s] quite a bit of attention to it," but that he would not agree that the report demonstrated that his prior statement about the rarity of design defect recalls was incorrect. The colloquy at issue follows:

> Q. And looking at this report, will you acknowledge to the jury that your statement up here about it being rare is not correct because there are many recalls of millions and millions of tires out there?
> A. I totally disagree with you, sir.
> [PLAINTIFFS' COUNSEL]: Move for admission, Your Honor, as a trial exhibit.
> THE WITNESS: You are -- I disagree with you.
> [PLAINTIFFS' COUNSEL]: I'd like to move for admission of Trial Exhibit 2973, Your Honor. May I pass you a copy?
> [DEFENDANTS' COUNSEL]: Your Honor, lack of foundation as well as objections on 403 in the Court's rulings pretrial. It's also hearsay.

The court excused the jury and permitted the witness to be further questioned, during which Plaintiffs' counsel examined Mr. Grant further:

> Q. Okay. Look for me, if you will, please, at the 2000 time frame, the 2001 time frame?
> A. Okay.
> Q. And look also at the 2008 time frame.
> A. Okay.
> Q. And when you look at that, can you and I agree that many of those are numbers in the hundreds of thousands, have to be when you do the math?
> A. Well, those are a couple of isolated situations, and if you average those you might get into that. And then you have to look at the specifics.
> Q. Have been across an entire line of tires, or at the very least, a large product of tires, fair?

---

upon by the witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness, by other expert testimony, or by judicial notice, may be used to impeach the expert witness's credibility but may not be received as substantive evidence.

Tenn. R. Evid. 618. This Court has previously noted that "[i]n light of the qualifications and process by which a witness may be permitted to testify as an expert, it is appropriate that requirements of equal dignity be imposed on the material used by a party seeking to impeach that expert's credibility." *Russell v. Illinois Cent. R.R. Co.*, No. W2013-02453-COA-R3-CV, 2015 WL 4039982, at *9 (Tenn. Ct. App. June 30, 2015), *perm. app. denied* (Nov. 25, 2015)

12

A. It's – it's possible. It's speculation, though. When you look at this as an aggregate, from a tiring engineering perspective and having reviewed these on a yearly basis, the vast majority of these manufacturing issues, the design issues on this list are extremely small, extremely rare.

Q. Some of those manufacturing issues involve the things you talked about up there, problems with chemistry, problems with processes, correct?

A. Those are not -- but from a manufacturing standpoint, not from a design standpoint.

Q. Please answer my question so we save some time.

A. Well, I can answer the question, but I have to put it in the proper context. The - - . . . You're asking – you're trying to convey that when I talk about design issues from a chemistry standpoint, a testing standpoint or an engineering standpoint, from a design standpoint, you are trying to, then, to convert that into manufacturing, engineering and chemistry. Those are two separate things. Two separate things.

These are by far manufacturing issues. The design issues on this list are extremely rare.

Q. Do you not consider the design process to be whether or not the tire is susceptible to problems with those things?

A. It depends upon the situation, depending on whether you're talking about it from a design standpoint or something that got changed or altered or not done correctly from the manufacturing standpoint. They're two separate issues.

Q. You talked about checks and reviews, testing and design here. The checks and reviews include the kind of adjustment data and material that the NHTSA has when they bring about a recall or a manufacturer on themselves brings about a recall, correct?

A. I'm sorry. I don't understand that long question.

Q. Your -- your statement to this jury was in an era where there are so many people involved with the design process -- engineers, chemists, and checks and reviews and testing and design, it's those very checks, reviews and testing that lead, usually, to the manufacturer and/or NHTSA doing a recall, correct?

A. No. I disagree.

At this point, Plaintiffs' counsel ended the voir dire, and the court sustained defense counsel's objection, holding:

[T]hese [reports] just simply show they were recalls. The witness did acknowledge that he relies upon this type of data, but there's no – nothing specific in this that indicates it's a design defect to be used as an impeachment for him. He was asked the question where he felt that this showed he was in error in his statement. I'm afraid you're going to have to

13

take his answer on that.

So I sustain the objection. However, I will receive [the NHTSA report marked for identification as Number] 2973 for identification purposes only as your offer of proof.

Plaintiffs contend that the trial court erred in sustaining the objection, which had the effect of preventing them from rebutting the testimony of Mr. Grant that design defects in tires are "extremely rare." They argue that his testimony "opened the door to any and all proof that contradicted his claim."

We respectfully disagree. Rule 618 allows an expert witness to be cross examined with information of the sort used by Plaintiffs here. Mr. Grant, however, did not acknowledge that the report addressed the same type of defect about which he had testified; rather, he explained that the report largely addressed a different matter altogether — manufacturing defects. In light of his testimony, the court's comment that "you're going to have to take his answer on that" was correct, and sustaining the objection to the use of the report and not permitting it to be received as substantive evidence was in accord with Rule 618 and not an abuse of discretion.

### 4. Evidence of Other Similar Incidents

Plaintiffs take issue with three rulings related to other similar incidents involving the Ford Explorer and Firestone tires during the testimony of two of its witnesses. We quote Plaintiffs' contentions verbatim:

The trial court (a) ruled that Dr. Renfroe could refer to the 71 other similar incidents ("OSIs") in Plaintiffs Exhibit 2944A (Tr. Ex. 2944A, filed Feb. 26, 2013, Volume 4) only in the most general of terms without going into the details of those incidents but (b) allowed Defendants to refer to such nebulous OSI numbers as 2.8 and 14.9 million without being held to the same standard of substantial similarity (Trans. Vol. 99, pp. 15-112; Trans. Vol. 110, pp. 105-7; Trans. Vol. 124, p. 150) and (c) confined Plaintiff expert Dennis Carlson's Venezuelan OSI testimony to American-made tires (Trans. Vol. 106, pp. 66-138).

With respect to subsection (a), Plaintiffs cite to Exhibit 2944A[11] and nearly 100 pages of the voir dire of Dr. Renfroe. This citation does not specifically direct us to the ruling at issue or to the evidence that Plaintiffs contend was admitted or excluded in

---

[11] Exhibit 2944A, which was received by the trial court for identification purposes only, is an 11-page document containing two spreadsheets. Both compiled similar data in columns titled: "Plaintiff/Claimant" or "Case Name"; "Accident Date" or "Incident Date"; "Vehicle" or "Vehicle Model"; "Tire"; "DOT"; "VIN"; "Injured"; "Fatality"; and for the first spreadsheet, "Plaintiff Attorney."

error. These citations do not comply with Rule 27(a)(6), (7)(A), and (g) of the Rules of Appellate Procedure, as well as Rule 6(a)(1), (b) of the Rules of the Tennessee Court of Appeals. In this instance, however, aided by the Defendants' brief, we have examined the record and determined that the ruling of which Plaintiffs complain is the following:

> What we've got first on the 2944(A) list of 79 purported other similar incidents, I think that the references to the tire, the attorneys, the DOT numbers, the number of people injured or fatalities all would clearly be irrelevant and should be redacted, but more importantly, I can't see how this list can come in as substantive proof with this witness in any form or fashion.
>
> Dr. Renfroe will be permitted to testify in general terms on these 79 OSIs that he has relied upon information that he has been provided of what he considers to be similar incidents, and I think he's laid a sufficient foundation that he's done enough research into this list to convince himself that he believes there's a sufficient similarity that he should consider them. But I think that it would be unfairly prejudicial and confusing, under 403, to allow this to come in in front of the jury and be revealed to them in any form or fashion other than the most general statement that, I've seen some other information, I've looked at it, and -- I do think that the witness should be permitted to say that he's seen 79 -- the number is appropriate. He can say he's seen 79 what he considers to be other similar incidents that he believes supports his opinion, and that's it.
>
> Now, if Defendants want to go into it, you can. If you want to quiz him about it, you certainly can go into the details of it, but if you go into the details of this with him, then, Mr. Denney [Plaintiffs' counsel], you will have opportunity on redirect to go into the details of why these appear to be substantially similar incidents.

With respect to (b), Plaintiffs assert that the court erred in "allowing Defendants to refer to such nebulous OSI numbers as 2.8 and 14.9 million without being held to the same standard of substantial similarity." Again, Plaintiffs' citations to the record do not direct us to any testimony of Defendants' witnesses but, rather, direct us to a remark made in closing argument by defense counsel and also to a request by Plaintiffs' counsel, during a jury-out portion of the redirect examination of Plaintiffs' expert Dennis Carlson, for a "withdraw instruction on the comments of 14.9 million tires and 9 million tires." Plaintiffs' brief provides no context for this request, and the context is not apparent from the colloquy between court and counsel cited by the Plaintiffs. Additionally, to the extent pertinent, the comment in the closing argument was not objected to by Plaintiffs' counsel. While Defendants' brief contains references to testimony of Donald Tandy, Robert Pascarella, and Brian Queiser relative to 2.8 million tires sold and 14.9 million Explorers produced, we do not assume that this is the evidence which Plaintiffs contend was admitted in error.

15

With respects to parts (a) and (b), we have attempted to comprehend Plaintiffs' argument despite the lack of adequate citations and in light of the legal authority upon which Plaintiffs rely but are unable to do so. Accordingly, we deem these issues waived. Tenn. R. App. P. 27(a)(7); *see also Sneed v. Bd. of Prof'l Responsibility of Supreme Court*, 301 S.W.3d 603, 615 (Tenn. 2010) (noting that "[i]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived.").

With respect to subpart (c), Plaintiffs argue that the trial court erroneously "confined [Mr.] Carlson's Venezuelan OSI testimony to American-made tires." Plaintiffs cite to 72 pages of the transcript of a jury-out hearing on the potential testimony of Dennis Carlson, necessitated by the court's instruction that it "want[ed] to hear Mr. Carlson talk about why these tires are similar." Plaintiffs do not cite to specific testimony or offers of proof within the 72 pages; however, the ruling at the end of the citation is:

> . . . Now, what I am concerned with, and I do not find it's been shown, that he has shown there is substantial similarity to the Venezuelan-constructed tires, and any testimony based upon Venezuelan OSIs has to be confined to those in which it's clearly shown that the tire involved was an American-made tire.

We have reviewed the testimony in its entirety and note that Mr. Carlson agreed that "[his] testimony here today does not go to the differences between the Venezuelan-manufactured-and-sold P255/70R16 tires and the Vidal tire"; clarified that he was not offering an opinion on the substantial similarity between the Venezuelan-made tire and the Wilderness AT, which was made in the United States; and agreed that he was aware that there were numerous differences in the components, material and compounds between those tires. This testimony was responsive to the court's question and demonstrates that Mr. Carlson could not offer testimony about the similarities between the two types of tires. We find no abuse of discretion in limiting Mr. Carlson's testimony to incidents involving similar (i.e., American-made) tires.

### 5. Expert's Opinions on Ethical Matters

In their "Statement of Material Facts," Plaintiffs state:

> The trial court (a) excluded the testimony of Plaintiffs' expert David Renfroe, Ph.D. regarding ethics and conspiracy (Trans. Vol. 100, pp. 153-9) (b) disallowed Dr. Renfroe's opinion whether, from an engineering standpoint, a manufacturer should accept the risk of rollover or redesign the vehicle to eliminate the defect causing same (Trans. Vol. 101, p. 81) and (c) precluded Plaintiffs' expert Dennis Carlson from opining whether Firestone

16

should have issued a public warning about its tires (Trans. Vol. 108, pp. 121-3).

Plaintiffs argue that "[b]ecause misbehavior may only be fully exposed by contrasting it to the ideal, Dr. Renfroe's testimony regarding engineering ethics was vital under Tenn. R. Evid. 702 to provide context for Plaintiffs' civil conspiracy case."

A party challenging the exclusion of evidence must make an offer of proof to enable the reviewing court to determine whether the trial court committed reversible error by excluding the proffered evidence. Tenn. R. Evid. 103(a)(2); *Dossett v. City of Kingsport*, 258 S.W.3d 139, 145 (Tenn. Ct. App. 2007). The first citation to the record in Plaintiffs' "Statement of Material Facts" is to part of a jury-out hearing on the scope of Dr. Renfroe's testimony; no actual or proffered testimony of Dr. Renfroe's is in this portion of the transcript. The second citation is to testimony of Dr. Renfroe which ends with an objection by defense counsel that the question asks for an answer "beyond this witness's competence"; the objection is sustained. Plaintiffs do not cite to an offer of proof as to what Dr. Renfroe's testimony would have been. Without such an offer of proof, there is nothing for us to review. *See Austin v. City of Memphis*, 684 S.W.2d 624, 628 (Tenn. Ct. App. 1984) (noting that "[w]here excluded testimony is not preserved in the record, the appellate court cannot consider an issue relating to the exclusion of same.").

With respect to Mr. Carlson, while Plaintiffs include a reference to his testimony in the above quoted portion of their brief's "Statement of Material Facts," in the argument section, they only refer to the testimony of Dr. Renfroe. Accordingly, as there is no argument to support Plaintiffs' position that Mr. Carlson's testimony was wrongfully excluded, we deem any issue with respect to Mr. Carlson's testimony on ethical matters to be waived. *See, e.g.,* Tenn. R. App. P. 27(1)(7)(A); *Bean v. Bean*, 42 S.W.3d 52, 56 (Tenn. Ct. App. 2000) (noting that "an issue is waived where it is simply raised without any argument regarding its merits"); *Murray v. Miracle*, 457 S.W.3d 399, 403 (Tenn. Ct. App. 2014).

### 6. Evidence of Spacers, Outboard Shock Absorbers, and a Ford Advertisement

Plaintiffs complain of the ruling excluding evidence they sought to introduce through Dr. Renfroe relating to the NHTSA's "fishhook" testing of Explorers and other vehicles after 2003[12]; of Ford's robot rolled steering test with two different versions of the Explorer's design; and of an advertisement run after 2000 by Ford Motor Company to

---

[12] No party explains in their brief what a "fishhook" test is, and none of the citations to the record regarding this issue contains an explanation.

show that "Ford moved to outboard the shocks on the F150 pickup and ran ads bragging that it prevented tramp in the rear." These matters were taken up during a jury-out hearing requested by Plaintiffs, and the Defendants' objections on the grounds of hearsay and improper redirect were sustained.[13] Plaintiffs argue that the evidence was admissible because "[t]he specific improvements demonstrated by Plaintiffs' expert reflected 'the state of scientific and technological knowledge available to the manufacturer' and 'the customary designs, methods, standards and techniques of manufacturing, inspecting, and testing by other manufacturers or sellers of similar products' at the time the subject vehicle was placed on the market" (quoting *Brown v. Crown Equip. Corp*, 181 S.W.3d 268, 281-82 (Tenn. 2005).

In *State v. Barnard*, the Tennessee Court of Criminal Appeals discussed the discretion afforded the trial court in managing the presentation of testimony:

> The admissibility of testimony and other evidence as well as the scope of redirect examination is within the sound discretion of the trial court, which will not be reversed absent an abuse of that discretion. *State v. Banks,* 564 S.W.2d 947, 949 (Tenn. 1978); *State v. Elrod,* 721 S.W.2d 820, 823 (Tenn. Crim. App. 1986). Furthermore, it is within the discretion of the trial court to allow a party on redirect examination to supply testimony omitted by oversight, or to clarify testimony given on direct examination, or, where the facts thus developed are not inconsistent with his previous answers to ask a witness to expand his testimony. 98 *Corpus Juris Secundum, Witnesses,* § 419, at 223.

899 S.W.2d 617, 624 (Tenn. Crim. App. 1994).

Plaintiffs do not explain how the evidence of these tests would corroborate the testimony of Dr. Renfroe about the improvements or state of scientific and technological knowledge available at the time the product was placed on the market. They do not argue

---

[13] Defendants objected to Plaintiffs' attempt to introduce evidence of the NHTSA's "fishhook" testing of Explorers and other vehicles after 2003 on the grounds of hearsay and improper redirect because the testing had not been discussed on cross examination. The trial court sustained the objection. Defendants also objected to Plaintiffs' attempt to introduce evidence of Ford's robot rolled steering test on the grounds of improper redirect because such testing was not discussed in cross examination and on the ground of hearsay. The court sustained the objection. With respect to the advertisement run by Ford, Defendants objected on the ground of improper redirect, hearsay, and a violation of a motion *in limine*. The trial court sustained the objection, noting that:

> I will put one asterisk to that; and, that is, it may be an appropriate area of questioning to a Ford witness. As to this witness, however, there is no showing that this was something he relied on as a basis of his opinion. And I do agree, the contents would be hearsay at this point. This would be an inappropriate witness to introduce it t[hr]o[ugh].

that the court abused its discretion in excluding the evidence and do not establish any foundation as to how the NHTSA tests or robot rolled steering tests came within the hearsay exception found at Rule 803(6) or (8) of the Tennessee Rules of Evidence. With respect to the Ford advertisement, during the course of argument of the objection, the court and parties agreed that this evidence could be introduced into evidence through the appropriate witness, other than Dr. Renfroe. Upon our review of the record cited by Plaintiffs and their argument, we conclude that the court did not abuse its discretion with reference to these rulings.

### 7. Dr. Renfroe's Proposed Testimony Regarding Mr. Guenther's Testing and Report

Prior to trial, the court ruled on Ford's motion *in limine* relative to testing performed and a report prepared by Dennis Guenther, an engineer who had been retained by Firestone to test the Explorer in contrast to two other SUVs.[14] The court granted the motion, holding:

> The Report or Testing of Dennis Guenther: This motion is GRANTED as to the contents or conclusions of Dennis Guenther's report. Plaintiffs' expert Dr. Renfroe may testify only that he relied upon testing performed by Mr. Guenther and that Mr. Guenther was retained by Firestone. He may not reveal any of Mr. Guenther's conclusions or any of the contents of his reports.

The court explained its reasoning for the above ruling, noting that the report was not an admission within the contemplation of Tennessee Rule of Evidence 803(1.2) and that any probative value it had was substantially outweighed by the danger of unfair prejudice. The court did allow that Defendants could:

---

[14] The pertinent portion of the motion *in limine* stated:

> Dr. Guenther is an engineer who has performed certain tests on two Ford Explorer vehicles at the request of Bridgestone/Firestone, Inc. ("Firestone"). Dr. Guenther has not been designated as an expert for Firestone (or anyone else) in this particular matter. The data underlying Dr. Guenther's testing has never been disclosed, nor has he ever been deposed on those issues. Dr. Guenther's testing is not relevant to the present matter, as none of Plaintiffs' vehicle experts contend that the subject 1998 Ford Explorer is defective from a handling standpoint. Moreover, Plaintiffs' vehicle expert, David Renfroe concedes that he is missing crucial details relating to Guenther's testing. Finally, Dr. Guenther's testing and report are, themselves, inadmissible hearsay. Tenn. R. Evid. 802. Ford moves for an order pursuant to Tenn. R. Evid. 702 to preclude any experts from relying upon or making mention of Dr. Guenther's testing or any document that references such testing. Ford also asks that this prohibition extend to any reference to Dr. Guenther's testing by any counsel, witnesses or expert, and to any reference by any party to Dr. Guenther's testing on cross-examination of Ford's witnesses.

. . . start asking question of Dr. Renfroe about [Mr. Guenther's tests and report] . . . and if they ask questions about it, obviously the Plaintiffs can go back into it. But the motion is well taken as far as excluding the disclosure of the actual contents of this test and Guenther's findings, either independently or through the testimony of Renfroe. But Renfroe can say he relied on it.

At trial, Plaintiffs attempted to introduce the video of Mr. Guenther's test as a demonstrative aid to Dr. Renfroe's testimony. The trial court ruled that the video could not be shown to the jury because "[t]here's no fair opportunity for these defendants to cross-examine the person in charge performing these tests to make sure there were no variations available that might have affected the way these vehicles operated" but stated that Dr. Renfroe could rely upon the Guenther report in forming his opinions and state as much to the jury.

Plaintiffs contend that the court erred in preventing Dr. Renfroe from "discussing in depth the testing of Dennis Guenther." Plaintiffs do not address how the court's ruling was an abuse of discretion, but rely upon *McDaniel v. CSX Transp. Inc*, 955 S.W. 257 (Tenn. 1997), for the proposition that the video of Dr. Guenther's tests should have been shown to the jury because it "provided uniquely essential corroboration for the opinions of Plaintiffs' expert [Dr. Renfroe]."

Plaintiffs' reliance on *McDaniel* is misplaced. The pertinent holding in *McDaniel* was that Tennessee Rules of Evidence 702 and 703 impose a duty upon trial courts to determine whether scientific evidence will substantially aid the trier of fact and whether the underlying facts and data relied on by the expert witness indicate a lack of trustworthiness. *Id*. at 265. The rationale and holding of *McDaniel* is to be applied when a trial court is considering whether expert testimony qualifies as reliable and is therefore admissible.[15] *See Payne v. CSX Transp., Inc.*, 467 S.W.3d 413, 455 (Tenn. 2015) (citing

---

[15] Interpreting Rules 702 and 703 of the Tennessee Rules of Evidence, the *McDaniel* Court held:

> [A] trial court must determine whether the evidence will substantially assist the trier of fact to determine a fact in issue and whether the facts and data underlying the evidence indicate a lack of trustworthiness. The rules together necessarily require a determination as to the scientific validity or reliability of the evidence. Simply put, unless the scientific evidence is valid, it will not substantially assist the trier of fact, nor will its underlying facts and data appear to be trustworthy, but there is no requirement in the rule that it be generally accepted.
>
> Although we do not expressly adopt *Daubert,* the non-exclusive list of factors to determine reliability are useful in applying our Rules 702 and 703. A Tennessee trial court may consider in determining reliability: (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is

*McDaniel*, 955 S.W.2d at 265).  There is no issue raised in this appeal as to the reliability of Dr. Renfroe's expert testimony.

When this matter arose during the course of trial, Plaintiffs' counsel made clear that Plaintiffs intended to use Dr. Renfroe's testimony to show the jury the video of the Guenther tests, which the trial court had previously excluded as hearsay and under Rule 703.  We have reviewed the transcript of the hearing on the motion *in limine* and find no error in the court's application of Rule 703, which states in pertinent part that "[f]acts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect."  We have not been cited to any evidence introduced in the trial which would call into question the ruling on the motion *in limine*, and we discern no abuse of discretion in that ruling or in excluding the video of Guenther's tests.

### 8. Dr. Renfroe's Opinion of the Decedent's Ability to Prevent a Rollover

Plaintiffs contend that the trial court erred when it sustained an objection to Dr. Renfroe providing an opinion as to whether the decedent could have prevented the rollover event.  Again, Plaintiffs do not cite us to the specific ruling at issue.  However, in their briefs, the Defendants direct us to the following ruling, which occurred in the course of Dr. Renfroe's testimony regarding the inability of a driver to maintain control of a vehicle when a tread separation event occurs.  As he testified, the jury was being shown a video featuring Mr. Arndt, a professional driver, encountering a slow tire tread separation event:

Q. Tell us what's going on here.
A. Okay. As he was coming up to where the camera was -- and you could have heard the tire chatter if you will -- that was when he was losing control from what you saw on the inside of the vehicle, and it was causing the vehicle to veer off to the right. But once he starts to tramp -- once he

---

known; (4) whether, as formerly required by *Frye,* the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

Although the trial court must analyze the science and not merely the qualifications, demeanor or conclusions of experts, the court need not weigh or choose between two legitimate but conflicting scientific views.  The court instead must assure itself that the opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation. . . .

*McDaniel*, 955 S.W.2d at 265.

gets started around and there's lack of this holding capability of the rear end because the wheels are bouncing, the rear end is just going to keep on going around, and that's what happened to him.

Q. And, Dr. Renfroe, was that a planned event?

A. No.

Q. Now -- and is that similar is to what happened ultimately to Mr. Vidal?

A. Except that in Mr. Vidal's case the tread came completely off, and it allowed him a few more moments of -- not control but he had -- it started him in the process of losing control eventually.

Q. And was there anything that Mr. Arndt could do to prevent that rollover when you examined it and looked at the film?

A. No.

Q. Is there anything Mr. Vidal could have done –

MR. PLATT: Objection, Your Honor, he did not reconstruct the accident.

THE COURT: Sustained.

Plaintiffs argue that this ruling "deprived the jury of this vital context" that Dr. Renfroe would have provided, due to his "unique position to evaluate the ability of an untrained driver such as Mr. Vidal to deal with these forces." Plaintiffs do not assert how the exclusion of this testimony was an abuse of discretion. In their brief on appeal, Defendants explain that their objection to the question was premised upon the fact that the rollover depicted in the video was not a reconstruction of Mr. Vidal's accident.

The purpose of the video, which had been introduced by Plaintiffs, was to show what happens in a tire tread separation event; the question asked, "Was there anything Mr. Vidal could have done," was not appropriate in the context of this video since the video did not depict or attempt to reconstruct the decedent's accident. Inasmuch as the video was not a reconstruction of the accident, the question was not probative of or pertinent to the jury's determination; the court did not abuse its discretion in sustaining the objection. Furthermore, immediately following the ruling on the objection, Dr. Renfroe testified, without objection or interruption, that during a tread separation at 70 miles per hour, a driver is "going to lose control" once the "skate process"[16] begins and that Mr. Vidal would not be able to control the car if the tire lost its tread. In light of this testimony, the jury was not deprived of the context that Plaintiffs wished to provide through the testimony of Dr. Renfroe.

---

[16] Though Plaintiffs never define the term "skate" in their brief on appeal, Defendants' brief informs us that "'skate' refers to an event that can happen when a vehicle is driven on a rough washboard road and hits a series of bumps that can cause its rear tires to vibrate and the rear of the vehicle to swing out, requiring a steering correction in the other direction."

Plaintiffs contend that the evidentiary errors cumulate to require a reversal of the verdict. Our disposition of the Plaintiffs' preceding issues disposes of this argument.

From our review of the record, there is material evidence to support the jury's determination that Ford and Firestone were not at fault for the accident that resulted in Mr. Vidal's death.[17] Accordingly, consideration of the remaining evidentiary issue that Plaintiffs' raise — the exclusion of evidence of the decedent's lost earnings — is pretermitted, as the jury never reached the issue of damages.

### B. Jury Instructions

Plaintiffs assert that the court erred in giving the jury an instruction on contributory negligence,[18] contending that Tennessee jurisprudence no longer recognizes contributory negligence.

Whether a jury instruction is erroneous is a matter of law that we review *de novo*. *Nye v. Bayer Cropscience, Inc.*, 347 S.W.3d 686, 699 (Tenn. 2011). "[I]t is our duty to review the charge in its entirety and consider it as a whole, and the instruction will not be invalidated if it 'fairly defines the legal issues involved in the case and does not mislead the jury.'" *Id.* (quoting *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 446 (Tenn. 1992)).

We reiterate the substantive law of San Luis Potosi governing Plaintiffs' negligence claim:

> ART. 1746 - He who acting unlawfully or against good customs causes damage to another, is obliged to repair, unless he proves that the damage was the result of inexcusable negligence or fault of the victim.

This law recognizes that there is a duty to act lawfully or in accordance with "good customs," that any breach of that duty results in an obligation to repair the damage caused

---

[17] When a jury verdict has been approved by the trial court, the scope of our review is limited to whether or not the record contains any material evidence to support the verdict. Tenn. R. App. P. 13(d); s*ee Harper v. Watkins*, 670 S.W.2d 611, 631 (Tenn. Ct. App. 1983); *Lassetter v. Henson*, 588 S.W.2d 315, 317 (Tenn. Ct. App. 1979). We must take the strongest legitimate view of all the evidence to uphold the verdict, assume the truth of all that tends to support it, discard all evidence to the contrary, and allow all reasonable inferences to sustain the verdict. *Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 823 (Tenn. 1994); *Moore v. Bailey*, 628 S.W.2d 431, 433 (Tenn. Ct. App. 1981).

[18] The court gave the following instruction:

> The Plaintiffs cannot recover in this action if you determine that the decedent was guilty of inexcusable negligence which was a legal cause of his death. In other words, Plaintiff cannot recover if decedent was at fault. This is known as contributory negligence.

by the defendant's breach, and that it is a defense to liability if the defendant can prove that the victim's own fault or inexcusable negligence caused the damage. These are the same elements that make out a claim for negligence in Tennessee. *See, e.g., Cullum v. McCool*, 432 S.W.3d 829, 832 (Tenn. 2013) (listing the elements of a negligence claim as (1) a duty of care; (2) a breach of the duty of care; (3) damages; (4) factual cause; and (5) proximate, or legal, cause). The current law of negligence in Tennessee requires the jury to allocate the percentage of negligence between the plaintiff(s) and defendant(s). *Id.* Article 1746, however, does not state that a plaintiff's recovery is to be reduced in proportion to the percentage of negligence attributable to him or her. *See McIntyre v. Balentine*, 833 S.W.2d 52, 57 (Tenn. 1992).

Considering the instructions as a whole, the court correctly instructed the jury on the negligence claim according to the law of San Luis Potosi; the phrase "contributory negligence" was not used as a statement of law but as an aside. Plaintiffs do not cite in their brief to any objection they made to the instruction. Moreover, the instruction to which the Plaintiffs object is similar to that requested by the Plaintiffs in their "Special Request For Instructions No. 2 Contributory Negligence."[19] We hold that this instruction fairly defines the legal issues involved in the case and did not mislead the jury; this issue is without merit.[20]

### C. Defendant's Issue on Appeal

On appeal, Defendants argue that, based on this Court's holdings in *Ramirez v. Bridgestone/Firestone, Inc.*, 414 S.W.3d 707 (Tenn. Ct. App. 2013), *perm. app. denied* (Tenn. Aug. 26, 2013), grounds exist to dismiss this case, rather than remand it for a new trial in the event this Court determines that prejudicial error occurred in the trial at issue.

---

[19] Plaintiffs' proposed instruction read:

> I instruct you that if you find that the defendants have established that the injuries and death of Jesus Vidal Ramirez was proximately caused by his own inexcusable negligence or culpability, such inexcusable negligence or culpability would be a complete defense to a claim of simple negligence of the defendants. In that regard, I instruct you that the defendants have the burden of proving by a preponderance of the evidence that the death of Mr. Vidal and the damages to his children were produced as a consequence of the inexcusable negligence or culpability of Mr. Vidal.

The record does not show that, in proffering this proposed instruction, the Plaintiffs made any reservation or qualification.

[20] Additionally, because the jury found that the Defendants were not at fault, the issue of inexcusable negligence on the part of the decedent was not reached, and we cannot conclude that any alleged error in the instruction more probably than not affected the jury's verdict. Tenn. R. App. P. 36(b).

Our resolution of the issues raised by Plaintiffs in this appeal pretermits our consideration of the merits of Defendants' contention.

**IV. CONCLUSION**

Based on the foregoing conclusions, we affirm the judgment in all respects.

RICHARD H. DINKINS, JUDGE